FILED

## IN THE UNITED STATE DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### Alexandria Division

| | |
|---|---|
| THE FLEXIBLE BENEFITS COUNCIL originally known as and d/b/a EMPLOYERS COUNCIL ON, FLEXIBLE COMPENSATION, | : : : : : |
| Plaintiff, | : : |
| v. | : Case No. 1:08cv371 (JCC/BRP) |
| | : |
| KENNETH FELTMAN, et al. | : |
| Defendants. | : : : |

## MEMORANDMUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTON FOR TEMPORARY RESTRAINING ORDER

### I.    INTRODUCTION

Defendants are engaged in concerted actions to steal Plaintiff's identity.  Plaintiff, The Flexible Benefits Council, originally known as and d/b/a Employers Council on Flexible Compensation ("ECFC") was incorporated as a non-profit corporation under the laws of the District of Columbia in 1981.  It was originally incorporated under the name **Employers Council on Flexible Compensation**, a name under which it has done business for 27 years.  For 23 of those years, (1985-July 2007), defendant Kenneth Feltman ("Feltman") was responsible for ECFC's management and operations. Originally, Feltman held the position of Executive Director of ECFC as a direct employee of ECFC (from 1985-1997). Thereafter, from 1997 through July 2007, Feltman continued to serve as ECFC's Executive Director as well as in other positions as an employee and/or principal of an association management company he formed, Radnor, Inc. ("Radnor") which in turn contracted with ECFC to provide the exclusive day to day management.

As detailed below, in 1998, unbeknownst to ECFC, its corporate charter lapsed (hereinafter referred to as "the lapse") due to the intentional and/or negligent acts of defendants Feltman (its Executive Director) and Radnor (its association management company). Thereafter, defendant Feltman and Radnor concealed and failed to rectify the lapse. ECFC did not learn about the lapse of its corporate charter until just a few weeks ago (on or about March 31, 2008) when Radnor disclosed this fact in another pending legal proceeding between Radnor and plaintiff ECFC. ECFC has promptly had its charter reinstated, however, it was forced to reinstate under a new name because of Defendants' wrongful acts until it can obtain the right to once again use its name of 27 years. (Complaint at ¶¶ 2, 51 and Carver Affidavit, Exhibit 1).

As part of plaintiff ECFC's ongoing investigation since March 31, 2008, it has determined that in the last 6 weeks the Defendants, with full knowledge of the lapse of plaintiff ECFC's charter (and defendant Feltman's participation in and concealment of that lapse), have engaged in wholesale theft of ECFC's identity. Specifically, the Defendants, either individually or in concert with each other as well as with other associates, have:

- incorporated a new D.C. entity known as Employers Council on Flexible Compensation, **Ltd.** ("ECFC, **Ltd.**", for ease of reference), thereby precluding Plaintiff ECFC from reinstating its corporate charter under that name;

- created the new entity (ECFC, **Ltd.**, for the stated purpose to consult in the "area of private employee benefit programs," precisely the same area of plaintiff ECFC's work for the last 27 years;

- reserved the name "ECFC" with the D.C. Division of Corporations thereby precluding the Plaintiff ECFC from reinstating its corporate charter under the acronym which it has used in its business for over 25 years;

- obtained for ECFC, **Ltd.**, in bad faith, the domain name "ecfc.com" which is identical and confusingly similar to plaintiff ECFC's mark ECFC and therefore constitutes cybersquatting;

2

- filed an application with the U. S. Patent and Trademark Office ("PTO") on behalf of the new entity, ECFC, **Ltd.**, to register the mark, "Employers Council on Flexible Compensation";

- filed an application with the PTO on behalf of the new entity, ECFC, Ltd., to register the stylized design mark "ECFC (& Design)" - - using a design that is identical to plaintiff ECFC's logo which plaintiff ECFC has used in commerce since at least as early as 1982;

- filed false and fraudulent declarations, under threat of criminal penalty, with the PTO asserting that ECFC, **Ltd.**, is entitled to use the above-described marks and that no other person or entity has the right to use the marks notwithstanding their knowledge of plaintiff ECFC's use of these marks for over 25 years;

- created a website that has stolen the look, feel, identical trademarks and mission statement of plaintiff ECFC; and

- secured an office address that is confusingly similar to that of ECFC's address.

This action seeks immediate redress of Defendants' wrongful acts. As detailed herein and in the Verified Complaint, defendants' wrongful acts constitute irreparable injury due to the confusion, mistake, deception and other harm caused by defendants' unauthorized use, misappropriation and/or registration of plaintiff ECFC's marks, domain name, logo and other protectable interests.

The harm continues on a daily basis. Plaintiff ECFC requests that the Court grant injunctive relief as soon as possible and, if possible, prior to the commencement of ECFC's annual conference which is scheduled to begin on April 23, 2008 where the harm caused by defendants' actions will only be exacerbated.

3

## II.   STATEMENT OF FACTS

### A.   Parties

Plaintiff ECFC was incorporated under the laws of the District of Columbia as a non-profit corporation on November 20, 1981. (Complaint ¶ 6, Exhibit 1).[1]  It was originally incorporated under the name Employers Council on Flexible Compensation, a name under which it did business for 27 years. (Id., ¶ 6, Exhibit 1). Plaintiff ECFC has a volunteer Board of Directors and dedicated to the maintenance and expansion of "private employee benefit programs on a tax-advantaged basis." (Id., ¶ 6, Exhibit 2).  ECFC has two driving missions.  The first is to represent and promote flexible compensation programs through effective lobbying. The second is to provide information on flexible compensation programs to members, national opinion leaders and the general public in order to help create a positive climate for the growth of flexible compensation.  (Id., ¶ 6, Exhibit 2).

For 23 years, (1985-July 2007), defendant Kenneth Feltman ("Feltman") was responsible for plaintiff ECFC's management and operations. (Id.,¶ 7).  Originally, defendant Feltman held the position of Executive Director of ECFC as a direct employee of ECFC (from 1985-1997). (Id.) Thereafter, from 1997 through July 2007, Feltman continued to serve as ECFC's Executive Director as well as in other positions as an employee and/or principal of an association management company which he formed, Radnor, Inc. ("Radnor"). In turn, Radnor contracted with ECFC to provide the exclusive day to day management. (Id.) Radnor was a party to three management services agreements with plaintiff ECFC from 1997 through July 2007. (Id.).  At any time that defendant Feltman did not hold the title of Executive Director of plaintiff ECFC (only in the last few years prior to his termination), he nonetheless was the person primarily

---

[1]     Exhibit references are to the exhibits attached to the Carver Affidavit.

responsible for the management and operations of ECFC either as a result of his positions with ECFC or his position as the principal and chief executive of Radnor, the management company for plaintiff ECFC. (Id.)

Defendant Anthony Hawks ("Hawks") is an attorney licensed to practice law in the Commonwealth of Pennsylvania and the District of Columbia. (Id., ¶ 8). He has been, at all times relevant hereto, counsel to Feltman, Radnor and ECFC, **Ltd.**, and is an officer (president and/or chief operating officer or both) defendant, ECFC, **Ltd.** (Id., ¶ 8, Exhibit 18, p. 4 and Exhibit 19, pp. 4 and 8).

Defendant ECFC **Ltd.**, is a corporation which was wrongfully organized by defendants Feltman and Hawks with the assistance of other associates in late February 2008 under the laws of the District of Columbia. (Id., ¶ 9, Exhibit 16).

**B.     Feltman's and Radnor's Relationship With ECFC**

In 1985, ECFC employed Feltman as its Executive Director. Feltman also began serving as ECFC's corporate Vice President. (Id., ¶ 10). As Executive Director and in other capacities described above, Feltman was the primary individual responsible for the management and operation of ECFC for twenty-three years. (Id., ¶ 10).

In 1997, after Feltman incorporated Radnor, ECFC and Radnor entered into a management services agreement ("the 1997 MSA") under which Radnor agreed to provide management services to ECFC. (Id., ¶11, Exhibit 3). Thereafter, Feltman continued his services for ECFC as Executive Director as well as in other positions described above through Radnor until ECFC terminated Radnor's (and hence Feltman's) services on July 31, 2007. (Id., ¶ 11). Radnor's services continued over this time period (1997-2007) under three separate management services agreement; *i.e.*, the 1997 MSA, a subsequent agreement executed in 2003 ("the 2003

5

MSA"), and a final agreement executed in 2005 ("the 2005 MSA"). (Id., ¶ 12, Exhibits 3, 4 and 5). Defendant Hawks represented defendant Feltman and Radnor in the negotiations of the 2005 MSA (Complaint, ¶ 12).

Each of those agreements gave Radnor (and hence defendant Feltman) the responsibility for the day-to-day management and operation of ECFC. (Complaint, ¶ 13). (*See* the 1997 MSA, Exhibit 3 at ¶ 1b; the 2003 MSA, Exhibit 4 at ¶ 1b, and the 2005 MSA, Exhibit 5 at ¶ 1b).[2] In his various positions defendant Feltman was the primary person responsible for the management and operation of plaintiff ECFC. (Id., ¶ 13). In addition, Feltman retained his status as a Vice President of ECFC until 2005 when he became a senior advisor to ECFC, while his company, Radnor, continued to manage plaintiff ECFC. (Id., ¶ 13).

Each of the management services agreements required that that management services Radnor (and hence, defendant Feltman) perform its obligations with "the same standard of diligence and care that would be applicable to a corporate executive of ECFC." (Complaint, ¶ 14). (*See* the 1997 MSA, Exhibit 3 at ¶ 24; the 2003 MSA, Exhibit 4 at ¶ 28, and the 2005 MSA, Exhibit 5 at ¶ 28). Moreover, Radnor, at all relevant times, held itself out as an ASAE-certified association management company. (Id., ¶ 15, Exhibit 6). ASAE-certified association management companies are required, among other things, to operate ethically and in compliance with all applicable laws and regulations. (Id., ¶ 15, Exhibit 7).

Also, among the services Radnor claims to offer to its clients is to "[m]anage trade and professional associations – so the members can concentrate on what they do best while we handle the backroom details." (Id., ¶ 16, Exhibit 6). Each of the management agreements

---

[2]        References to "Exhibit" refer the exhibits attached to the Carver Affidavit.

required Radnor (and hence defendant Feltman) to treat as confidential "all the records,

materials, data and documents to which it is given access and control.." (Id., ¶ 17).

As a result of defendant Feltman's status as an officer of ECFC and the obligations

imposed by the management services agreements, Radnor and defendant Feltman owed plaintiff

ECFC fiduciary, ethical, and other obligations. (Id., ¶ 18).[3]

### C. Feltman Permits And Thereafter Conceals The Lapse of ECFC's Corporate Status

Prior to the execution of the 1997 MSA, as Executive Director and Vice President of

ECFC, defendant Feltman was involved in maintaining plaintiff ECFC's corporate status.

(Complaint, ¶ 19). For example:

> (a)    in 1990 and 1991, as Vice President of ECFC, Feltman signed the Statement of
>
> Change of Registered Office submitted to the D.C. Department of Consumer and
>
> Regulatory Affairs ("the DCRA"). (Complaint, ¶ 20a). (*See* Exhibits 22 and 23);

---

[3]     Association management companies accredited under the ASAE Accreditation Program for Association Management Companies [must]:

> 1. Recognize the unique missions, goals, structures, and needs of their association clients and use their best efforts to meet those needs.
> 2. Operate ethically and in compliance with all applicable laws and regulations.
> 3. Accurately represent the expertise, experience, credentials, and services of their Companies and their employees to the public.
> 4. Manage all client accounts and funds in compliance with accounting rules and regulations as promulgated by the Financial Accounting Standards Board.
> 5. Observe federal tax requirements for maintaining the tax status of their clients.
> 6. [6-11 omitted].
> 12. Maintain full and accurate records of current and prior association clients, maintain the confidentiality of all association client records, data, proceedings, contracts, and other information, and maintain and provide a written confidentiality policy to all clients, either as part of or separate from the written contract with the client.
> 13. [13-15 omitted].

*(See* Exhibit 7) (screenshot from ASAE website at
www.asaecenter.org/AboutUs/contentCAE.cfm?ItemNumber=8299).

    (b)     in 1991 Feltman also signed ECFC's Annual Report submitted to the DCRA.

(Complaint, ¶ 20b, Exhibit 8);

    (c)     in 1995, ECFC employee and Assistant Treasurer, Bonnie Whyte (who later

became a Radnor employee under the 1997 MSA), signed the Annual Report on

behalf of ECFC. (Id., ¶ 20c, Exhibit 9).

No annual report was filed in the District of Columbia by plaintiff ECFC in 1997 because

of a change in the D.C. filing requirements from annual filing to filing every other year. (Id., ¶

21).

ECFC's annual report was due to be filed with the District of Columbia on April 15,

1998. However, apparently neither Radnor nor Feltman took any steps to ensure that plaintiff

ECFC's 1998 Annual Report was filed.

(Id., ¶ 22).

As a consequence of Radnor and defendant Feltman's (in)actions, unbeknownst to

ECFC's Board of Directors, plaintiff ECFC's 1998 Annual Report and filing fees were never

filed with the District of Columbia. (Complaint, ¶ 23). As a result, plaintiff ECFC's corporate

charter was revoked in September 1998. (Id., ¶ 23).

Each of the management services agreements placed the full responsibility of managing

plaintiff ECFC's day-to-day operations on Radnor, which included filing ECFC's annual reports

with the D.C. government. (Complaint, ¶ 24). (See discussion, *supra.*, II(B)). Moreover, as an

ASAE-certified association management company, Radnor not only had the obligation to

"operate ethically and in compliance with all applicable laws and regulations," but it was

required to "[o]bserve federal tax requirements for maintaining the tax status of their clients,"[4]

---

[4]     *See* ASAE website at www.asaecenter.org. (Exhibit 7, items 2 and 5).

one of which would be to ensure that ECFC's corporate charter remained in place. (See Complaint, ¶ 15, Exhibit 7). Defendant Feltman knew that. To this day, as part of the description of the association management services it provides, Radnor's website, www.radnor-inc.com, states that: "**Radnor will…[p]repare all tax returns and other required returns and forms.**" (Id, ¶ 25, Exhibit 10).

Without knowing that its corporate charter had been revoked in 1998, ECFC continued to conduct its business without interruption while defendant Feltman was responsible for its management (through July 2007) and thereafter, up to the present date. (Complaint ¶ 26) The business conducted by ECFC included and continues to include holding annual conferences and symposiums for its members, providing newsletters and bulletins, sponsoring and administering a certification program for designations as Certified in Flexible Compensation or Certified in Flexible Compensation Instruction and lobbying efforts. (Id.)

**D.     ECFC Just Learned Its Corporate Charter Lapsed Eleven Years Ago**

Plaintiff ECFC first became aware that its 1998 Annual Report had not been filed on March 31, 2008. (Id., ¶ 27). At no time prior to March 31, 2008, did Radnor, defendant Feltman or anyone else ever advise plaintiff ECFC that there were any problems with ECFC's corporate status or corporate filings. (Id., ¶ 27).

Plaintiff ECFC presently does not know when Radnor and defendant Feltman first learned of the lapse of ECFC's corporate status, although it is certain that Radnor knew no later than February 6, 2008, as discussed below. . (Complaint, ¶ 28).

Upon information and belief, defendant Feltman knew of the corporate lapse many years ago. Plaintiff ECFC's investigation has revealed that on March 7, 2003, ECFC Board member

Anthony Mazzeo, via email, asked Feltman, as ECFC's Executive Director, for a copy of the ECFC corporate charter maintained by Radnor as ECFC's management company. Feltman wrote to the ECFC board member: "I have never been able to find a charter or other organizing document. The incorporation was filed with the D.C. government and we have never had a copy in the office **but I will order one from the D.C. government.**" It appears that by June 1, 2003, Feltman sent Mazzeo the 1981 corporate charter. (Id., ¶ 29, Exhibit 11).

Hence, by June 1, 2003 at the latest, defendant Feltman clearly knew or should have known that plaintiff ECFC's corporate status had lapsed when he contacted the D.C. government to request a copy of ECFC's charter. (Id., ¶ 30, Exhibit 12). Moreover, defendant Feltman should have known in 1998 when he an Radnor failed to file the ECFC annual report that plaintiff's status as a corporation would be revoked. (Complaint, ¶ 30).

Radnor and Feltman certainly knew how to maintain a corporation in good standing because throughout the years, they have kept Radnor's status in good standing with the D.C. government. *See, e.g.*, Radnor's Application for Certificate of Authority to transact business as a foreign corporation in the District of Columbia filed on August 22, 2001[5] (Exhibit 24) and Radnor's annual reports for 2002, 2004 and 2006 filed with the D.C. government. (Exhibits 13, 14 and 15). Yet, despite being paid a management fee by ECFC of nearly one million dollars a year, Feltman did not ensure that the same reports and fees were filed for its client, ECFC.

E.     **Radnor And Feltman's Services Are Terminated In July 2008 And Arbitration Ensues**

As noted above, on July 31, 2007, plaintiff ECFC terminated Radnor's (and defendant Feltman's) services under the 2005 MSA. (Complaint, ¶ 31).

---

[5]     Although Radnor had been managing ECFC since 1997, the Application falsely states that Radnor commenced transacting business in the District on August 15, 2001. *See* Exhibit 24.

Thereafter, on November 13, 2007, plaintiff ECFC filed a demand in arbitration against Radnor, as provided for under the 2005 MSA. In its demand for arbitration, ECFC alleges that as ECFC's Executive Director, Feltman and Radnor pilfered millions of dollars from ECFC. The arbitration is pending and a hearing on the merits is set to begin on July 21, 2008. (Id., ¶ 32).

**F.     Radnor Discloses The Lapse Of ECFC's Corporate Charter**

Shortly after Radnor's motion for partial summary judgment in the arbitration was denied on March 20, 2008, and Radnor's deposit for arbitration fees were due, defendant Feltman did two things to finally disclose to ECFC's Board and its new Executive Director that ECFC's charter had lapsed during defendant Feltman's tenure as the Executive Director of ECFC. (Complaint, ¶ 34).

First, after participating in the arbitration for over four months, on March 31, 2008, Radnor filed a motion to dismiss in the arbitration. In its motion to dismiss, Radnor disclosed that ECFC's charter had lapsed and therefore argued that the arbitration demand filed by ECFC was a nullity. (Id., ¶ 35). That motion has been briefed and is currently under advisement with the arbitration panel. Remarkably, Radnor and defendants Feltman and Hawks took those positions notwithstanding the facts that (a) Radnor and defendant Feltman were responsible for and/or concealed the lapse of plaintiff ECFC's charger for many years; and (b) Radnor asserted in its counterclaims that the 2005 MSA was a valid and binding contract and sought specifically to enforce the terms of the 2005 MSA in its motion for partial summary judgment .(Id., ¶ 35).

Second, on or about March 31, 2008, Radnor filed suit in the Superior Court of the District of Columbia against plaintiff ECFC and its individual board members. Radnor claims that the D.C. Superior Court should declare ECFC dissolved and placed in receivership. (Complaint, ¶ 36). Among other things, Radnor also seeks to hold all board members

11

individually liable for the same claims it asserts against ECFC in the arbitration. (Id., ¶ 36). Defendant Hawks represents Radnor in the Superior Court litigation.

As noted earlier, there is no question that by February 6, 2008, Radnor and Feltman knew about the lapse of ECFC's corporate status. On that date, Articles of Incorporation for an entity known as "Employers Council on Flexible Compensation, Limited," were signed. . (Complaint, ¶ 38). (Exhibit 16)[6]. These Articles of Incorporation were filed with the D.C. Department of Consumer and Regulatory Affairs on February 29, 2008. (Id., ¶ 38, Exhibit 16). This is one of many acts taken by Radnor and Feltman in concert with several associates, including Radnor's attorney of record in the arbitration, defendant Hawks, to systematically steal ECFC's identity.

**G.   ECFC Has Learned Recently That Over Several Months The Defendants Have Systematically Attempted To Steal ECFC'S Identity**

In recent days, plaintiff ECFC learned that its former Executive Director, defendant Feltman, in concert with several associates, including his attorney in the arbitration and D.C. litigation, defendant Hawks, has apparently been scheming to steal the identity of plaintiff ECFC in several unlawful and unethical ways. (Complaint, ¶ 37).

While plaintiff ECFC does not know the full scheme at this point, ECFC has discovered (see, Complaint, ¶¶ 37-52), that someone formed and registered a new D.C. corporation known as Employer's Council of Flexible Compensation, **Ltd.**, (again, "ECFC Ltd.," for ease of reference).

(a)   Specifically, on February 6, 2008, Shanisha Wright, purportedly of Las Vegas, Nevada signed Articles of Incorporation of Employers Council of Flexible Compensation, **Ltd.**, a District of Columbia Corporation. (Exhibit 16);

(b)   On February 29, 2008, Articles of Incorporation for ECFC, **Ltd.** were filed with

---

[6] Again, the referenced exhibits are attached to the Carver Affidavit.

the D.C. Department of Consumer and Regulatory Affairs government.  (Exhibit 16);

(c)     Upon information and belief, these acts were performed in concert with Feltman and Hawks and/or their associates.

These acts have precluded plaintiff ECFC from reinstating its corporate charter with the name it has used for over 27 years – including 23 years when defendant Feltman was ECFC's Executive Director.

This new entity, ECFC, **Ltd.,** created by the defendants states that its purpose is to consult in the "area of private employee benefit programs" (Exhibit 16).  This is precisely the same area of work for plaintiff ECFC for the last 27 years (Exhibit 2).

ECFC also discovered that on March 28, 2008, Feltman (ECFC's former Executive Director), reserved the acronym "ECFC" with the D.C. Corporation Division thereby precluding plaintiff ECFC from reinstating its corporate charter with at least the acronym which it has used as a trademark in its business and in its logo for 27 years (again, including 23 years when Feltman was ECFC's Executive Director).  (Exhibit 17, computer screen for Corporation Division).

On March 3, 2008, this "new" corporation, defendant ECFC, **Ltd.,** acting through its President and Chief Operating Officer, defendant Hawks, applied to the PTO to register the mark, "Employers Council on Flexible Compensation" -- the name used by plaintiff ECFC for the last 27 years.  (Exhibit 18, pp.1-6).

On March 4, 2008, ECFC, **Ltd.,** again acting through defendant Hawks, applied with the PTO to register a design mark using the acronym "ecfc" (Exhibit 19 at pp.1-6) using a design

13

that is identical to the logo plaintiff ECFC has been using for 27 years. (Compare the design of ECFC Ltd. (Exhibit 19 at pp. 1, 6) to plaintiff ECFC's logo (Exhibit 20)).

Moreover, defendant ECFC, **Ltd.** has obtained a domain name (ecfc.com) which is confusingly similar to both plaintiff ECFC's trademarks (ECFC and ECFC (& Design) and plaintiff ECFC's domain name (ecfc.org). (Compare ECFC **Ltd.'s** website (Exhibit 21) with plaintiff ECFC's website (Exhibit 20)).

Defendant ECFC, **Ltd.** has established a website that is remarkably similar to ECFC's website and contains a mission statement virtually identical to plaintiff ECFC's mission statement. (Compare defendant ECFC, **Ltd.'s** web page at www.ecfc.com, including pages entitled "The Critical Issue," "Mission," and "Communication," (Exhibit 21) with plaintiff ECFC's website at www.ecfc.org (Exhibit 20) and mission statement (Exhibit 20, p. 2) which illustrates the extent to which defendant ECFC, **Ltd.** has taken plaintiff ECFC's look, feel, design and substance directly from plaintiff ECFC's website.

Defendant ECFC, **Ltd.** has obtained offices on the same street as plaintiff ECFC's offices with the same suite number. (*See* Exhibit 16 showing defendant ECFC **Ltd.'s** address at 1015 15th Street, N.W., Suite 1000, Washington, D.C. 20005, which is confusingly similar to the address used by plaintiff ECFC, 927 15th Street, N.W., Suite 1000, Washington D.C. 20005; Exhibit 20).

In addition, as part of the applications to register the marks described above on behalf of defendant ECFC, **Ltd.**, defendant Hawks asserted that the applications were based on the intent to use the mark in commerce in connection with certain services which are identical to the services provided by plaintiff ECFC; to wit:

> "[m]aintaining and expanding private employee benefit programs on a tax-advantaged basis by (1) representing and promoting flexible compensation programs through

14

effective lobbying, and (2) providing information on flexible compensation programs to clients, national opinion leaders and the general public to help create a positive climate for the growth of flexible compensation, in [c]lass 35."

*See* Exhibit 18, p.2 and Exhibit 19, p.2; compare to ECFC's mission statement, Exhibit 20, p.2.

Also, as to both applications, notwithstanding his personal knowledge of plaintiff ECFC through negotiations of the 2005 MSA and payment therefore by ECFC and otherwise, defendant Hawks executed a false and fraudulent declaration, stating, under threat of criminal penalty, that defendant ECFC, **Ltd.**, not the plaintiff ECFC, was the owner of the marks and that no one else had rights to the marks. *See* Exhibits 18 and 19 at p.5. The applications included the following false and fraudulent declaration executed by defendant Hawks in his capacity as Chief Operating Officer of defendant ECFC, **Ltd.**:

> The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce, to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Thereafter, on April 4, 2008, as to both applications, defendant Hawks filed allegations of use with the PTO claiming current use of the marks in connection with all of the services referenced above since April 1, 2008. (Exhibit 18 at pp.7-9 and Exhibit 19 at pp.7-9). He executed these allegations of use as President of defendant ECFC, **Ltd.** (*Id*. at p. 9). Again, defendant Hawks filed an inaccurate declaration under threat of criminal penalty:

Applicant requests registration of the above identified mark….Applicant is the owner of

15

the mark sought to be registered and is using the mark in commerce on or in connection with the goods/services identified above,.....The undersigned being hereby warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001 and that such willful false statements and the like may jeopardize the validity of this document, declares that he/she is properly authorized to execute this document on behalf of the Owner and all statements made of his/her own knowledge are true and that all statements made on information and belief are believed to be true. (Exhibits 18 and 19 at p.9).

Upon information and belief, ECFC believes that all of the above actions were performed in concert with Feltman and ECFC, **Ltd.**, as well as with other associates currently unknown to plaintiff. [7]

Because plaintiff ECFC has only just learned the above-referenced information, there is strong reason to believe that there exists substantial additional evidence in support of the inescapable conclusion that Feltman's counsel, Anthony W. Hawks, in concert with defendant Feltman, is attempting to steal plaintiff ECFC's identity through the auspices of defendant ECFC, **Ltd.**

Plaintiff ECFC has had its charter reinstated in the District of Columbia but because of defendants' wrongful acts it has been forced to reinstate with a new name ("The Flexible Benefits Council") until it can regain the right to use its original name by court order or otherwise. (Complaint at ¶¶ 2, 51 and Exhibit 1).

## III.   ARGUMENT

### A.   Standards For Temporary Or Preliminary Injunctive Relief

The issuance or denial of a preliminary injunction or temporary restraining order ("TRO") "is committed to the sound discretion of the trial court." *Quince Orchard Valley Citizens Ass'n, Inc v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989).  In determining whether an

---

[7]   It should be noted that during the 20 plus years that Feltman managed ECFC, he never filed for trademark protection for any of the marks or designs now sought for ECFC, **Ltd.**, nor did he obtain the domain name www.ecfc.com on behalf of defendant ECFC.

injunction is appropriate, a district court must apply the "balance-of-hardship" test. *See Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 194 (4th Cir. 1977); *Railway Labor Executives' Ass'n v. Wheeling Acquisition Corp.*, 736 F. Supp. 1397, 1401-02 (E.D. Va. 1990) (Ellis, J.) (applying *Blackwelder* test to determine issuance of temporary restraining order).

Under the test, a court should examine the following four factors: (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest. *See Hughes Network Systems, Inc. v. InterDigital Comm'n Corp.*, 17 F.3d 691, 693 (4th Cir. 1994); *Blackwelder Furniture*, 550 F.2d at 193-96. No single factor can defeat a motion for a preliminary injunction or TRO. Rather, "[t]he decision to grant or deny a preliminary injunction depends upon a 'flexible interplay' among all the factors considered." *Blackwelder Furniture*, 550 F.2d at 196.

### 1.   Balance of the Hardships

In the case at hand, without a TRO, Plaintiff will suffer irreparable injury as a result of Defendants' attempt to steal its identity. Plaintiff has used the marks "ECFC" and "Employers Council on Flexible Compensation" and the ECFC logo for nearly thirty (30) years in connection with its goods and services. Defendant ECFC, Ltd., a newly formed entity, is using Plaintiff's marks in commerce in connection with the sale, offering for sale, distribution, or advertising of goods and services, which purport to be directly competitive with those of Plaintiff. Consumers have come to associate Plaintiff as the origin of goods and services offered under the marks. Whereas, Plaintiff has offered its goods and services for nearly thirty (30) years, defendant ECFC, Ltd. is a newly formed company. Accordingly, whereas Plaintiff has an established

reputation in the industry and a large member base which it could potentially lose to Defendants by virtue of Defendants' actions, ECFC, Ltd., as a brand new entity, presumably, does not have any significant member or client base to lose. In addition, Plaintiff fears its members will inadvertently contact defendant ECFC, Ltd., which has occurred already on at least one documented occasion, thinking that they are contacting the Plaintiff.

Again, plaintiff, ECFC's annual conference is set to begin on April 23, 2008 and the harm will only be exacerbated if the defendants are not enjoined prior to that time. (Complaint, ¶ 52). Accordingly, the balance of the hardships weighs heavily in favor of granting Plaintiff's request for a TRO.

### 2.    Likelihood of Success on the Merits

Plaintiff has established a strong likelihood of success on the merits of its trademark, copyright, and cybersquatting claims.

### *Plaintiff's Likelihood of Success on its Trademark Claim*

The Lanham Act, 15 U.S.C. § 1125(a), protects registered and unregistered marks against the use of any word, term, symbol or mark that is likely to confuse consumers about the origin of the marks. To establish its Lanham Act claim, ECFC must show (1) it has a valid, protected trademark and (2) that the defendant's use of a similar trademark is likely to cause confusion among consumers. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir. 1995). The ECFC marks are valid, legally protected marks.

The likelihood of confusion inquiry centers on whether the defendant's use of a colorable imitation of the trademark is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. §§ 1114(1), 1125(a)(1). In order to determine whether there is a likelihood of confusion over the mark, Fourth Circuit courts look to seven factors: (a) the strength or distinctiveness of

the mark; (b) the similarity of the two marks; (c) the similarity of the goods/services the marks

identify; (d) the similarity of the facilities the two parties use in their business; (e) the similarity

of the advertising used by the parties; (f) the defendant's intent; and (g) actual confusion.

*Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984).

A court need not weigh each of these factors equally; rather, the determination is made on

a case-by-case basis. *See id.; Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463 (4th Cir.

1996); *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992) (noting that

the *Pizzeria Uno* factors are merely a guide—"a catalog of various considerations that may be

relevant in determining the ultimate statutory question of likelihood of confusion"--and that all

factors are not always relevant in a given case). However, the Fourth Circuit has also noted that

the seventh factor, actual confusion, "is often paramount. When the plaintiff's mark is strong

and the defendant's use of a similar mark 'has actually confused the public, our inquiry ends

almost as soon as it begins.'" *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th

Cir. 2001).

### a.      Strength or Distinctiveness of the Mark

Plaintiff has used the marks "ECFC" and "Employers Council on Flexible

Compensation" since at least as early as 1981 in connection with its goods and services. In

addition, Plaintiff has used the mark "ECFC (& Design)" (hereinafter "ECFC logo" since at least

as early as 1982 in connection with its goods and services. Each of these marks is distinctive,

and Plaintiff has used each continuously and exclusively in U.S. commerce for approximately 26

or 27 years. To the extent any of the marks was not inherently distinct, it has acquired

distinctiveness and secondary meaning as a result of such longstanding continuous and exclusive

use by Plaintiff.

The marks "ECFC" and "Employers Council on Flexible Compensation" and the ECFC logo appear in printed and in other tangible materials produced by ECFC, and in electronic form on the ECFC.org website. Through the years, Plaintiff has sponsored conferences, seminars, workshops, and other events at which it has used and displayed the marks. In addition, the relevant trade press has referenced Plaintiff and its marks. Therefore, as a result of Plaintiff's efforts, relevant consumers have come to associate Plaintiff as the origin of goods and services offered under the marks.

The strength and distinctiveness of the ECFC marks weighs heavily in favor of ECFC's likelihood of success on the merits.

**b.     Similarity of the Marks**

The second factor courts evaluate is the similarity of the marks. Defendants have willfully, intentionally and directly copied Plaintiff's marks. Defendants' registration of the Internet domain name ECFC.com, their creation and publication of a web site at www.ECFC.com to advertise services that purport to be identical those offered by ECFC, and their use of the marks "ECFC", "ECFC (& Design)" and "Employers Council on Flexible Compensation" on such web site constitute unauthorized uses in commerce of Plaintiff's "ECFC", "ECFC (& Design)" and "Employers Council on Flexible Compensation" marks, which have caused and are likely to continue to cause confusion and mistake, and to deceive or confuse consumers into believing that the source or origin of Defendants' goods and services provided at the domain name is Plaintiff ECFC and/or that any information or services or products offered by or through that web site are endorsed by, sponsored by, or otherwise affiliated with ECFC. Confusion has been exacerbated because defendants have made the calculated decision to copy the look and feel of plaintiff ECFC's website.

20

c.   **Similarity of the Goods, Services, Facilities, and Marketing of The Marks**

The Court next considers factors related to the similarity of goods or services the marks identify, similarity of the facilities, and similarity of the marketing of the marks. Defendants offer the exact same goods and/or services as Plaintiff, have similar facilities (and, in fact, almost identical addresses), and similarly advertise their marks (as described above, Defendants have even copied text from Plaintiff's website as well as the look and feel of plaintiff's website).

d.   **Defendants' Intent**

The next factor the Court considers is the intent of defendants. "If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc. to resemble the other so as to induce confusion." *Pizzeria Uno*, 747 F.2d at 1535. There can be no question that Defendants are deliberately trying not only to create confusion, but to usurp Plaintiff's entire business.

e.   **Actual confusion**

Actual confusion is the final *Pizzeria Uno* factor used to determine likelihood of confusion. *Lyons P'ship, L.P.*, 243 F.3d at 804. Defendants' acts have resulted in actual confusion. On April 14, 2008, for example, ECFC member Monica Tormey mistakenly sent an e-mail intended for ECFC's Executive Director David M. Carver to an e-mail address at ecfc.com. (Complaint, ¶ 64, Exhibit 25).

Consideration of these factors strongly indicates that Plaintiff will succeed on the merits of its trademark claim.

### *Plaintiff's Likelihood of Success on its Copyright Infringement Claim*

Plaintiff is similarly likely to succeed on its copyright infringement claim. Plaintiff owns

all rights, including copyright rights, in and to certain text (including but not limited to Plaintiff's mission statement and other materials) and graphics (including but not limited to the distinctive logo ("ECFC (& Design)") contained on ECFC's its web site, www.ecfc.org. Defendants have long had access to Plaintiff's web site and the text and graphic materials thereon. By copying and publishing text and graphics from Plaintiff's web site on their own web site, www.ecfc.com, Defendants have violated the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*

### *Plaintiff's Likelihood of Success on its Cybersquatting Claim*

Finally, Plaintiff is likely to succeed on its cybersquatting claim. As demonstrated herein, Defendants have registered and used a domain name that is identical or nearly identical to Plaintiff's marks with a bad faith intent to profit from the registration and use of such domain name. Defendants registered, trafficked in, and used a domain name that is confusingly similar to Plaintiff's marks. Plaintiff's marks were distinctive at the time that Defendants registered or otherwise obtained the infringing domain name.

Defendants registered the domain name with the deliberate intent to divert consumers of Plaintiff's goods and services from Plaintiff and Plaintiff's web site www.ecfc.org to a site accessible under the domain name ecfc.com for commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the site at www.ecfc.com.

Defendants' bad faith is evidenced by, inter alia, (i) the copying of the look and feel of Plaintiff's web site, including the direct copying of Plaintiff's marks and the graphics used on Plaintiff's site, (ii) the virtually identical nature of the stated mission of both organizations on their respective web sites, and (iii) Defendants' registration of the domain name using a service that shields a registrant's identity, rather than providing full contact information for the registrant of the domain name.

22

Defendants' registration, use of and trafficking in the infringing domain names has harmed the goodwill represented by Plaintiff's marks by creating actual confusion and a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of Internet sites accessible under those domain names.

Defendants' infringing conduct has caused substantial irreparable injury to Plaintiff.

## IV.   CONCLUSION

Wherefore, for the reasons stated herein, Plaintiff ECFC respectfully requests that the Court enter a temporary restraining order enjoining Defendants, their agents, successors and assigns, and all others in active concert or participation with Defendants, from:

1.      Using in any manner the marks and/or names "ECFC", ECFC logo and "Employers Council on Flexible Compensation", and/or mark, name or symbol of identification which is a colorable imitation or otherwise likely to be mistaken for or confused with plaintiff ECFC's marks and/or names "ECFC", "ECFC logo" and "Employers Council on Flexible Compensation", and from continuing to register, use, market, sell, offer for sale, dispose of, license, transfer, display, advertise, reproduce, or make available any services and/or products bearing plaintiff ECFC's marks and/or names or any variation thereof which is likely to cause confusion, mistake, or deception among members of the trade and public, and from participating or assisting in any such activity, including, but not limited to, domain names, directory names, metatags, hyperlinks, or any computer address to identify Defendants' web site or in connection with the retrieval of data or information, or other goods and services which are likely to conflict with plaintiff ECFC's pre-existing rights in the marks and/or names "ECFC", "ECFC logo" and "Employers Council on Flexible Compensation";

2.      Representing by any means whatsoever, directly or indirectly, that Defendants, and any products or services offered by Defendants, including information services provided via Defendants' website, the Internet or otherwise, are affiliated or associated in any way with, or sponsored by, plaintiff ECFC or its goods or services, and from otherwise taking any other action likely to cause confusion, mistake or deception on the part of consumers including, but not limited to, Internet users; and

3.      Performing any other acts calculated or likely to cause confusion or mistake in the mind of the public or to lead consumer including, but not limited to, Internet users into believing that Defendants' goods or services come from, or are the goods or services of, plaintiff ECFC, or are somehow sponsored or underwritten by, or affiliated with, plaintiff ECFC, and from otherwise unfairly competing with plaintiff ECFC or misappropriating the goodwill represented by the mark and name, which rightfully belongs to plaintiff ECFC.

4.      Defendants:

a.      To relinquish the registration of the domain name ECFC.com;

b.      To transfer their registration of such domain name to plaintiff ECFC;

c.      To cease publication of all contents presently, or planned by defendants to be, posted or otherwise published on the website at www.ECFC.com,

d.      To limit their use of a domain name or names to those that do not use plaintiff ECFC's marks, and/or any colorable imitation of such marks, or any thing or mark confusingly similar thereto.

Respectfully submitted,

THE FLEXIBLE BENEFITS COUNCIL
originally known as and d/b/a
EMPLOYERS COUNCIL ON
FLEXIBLE COMPENSATION
By Counsel

/s/
_____
Bernard J. DiMuro, Esquire
Virginia State Bar #18784
*Counsel for Plaintiff*
DiMuroGinsberg, P.C.
908 King Street, Suite 200
Alexandria, Virginia 22314
Ph. (703) 684-4333
Fax (703) 548-3181
bdimuro@dimuro.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2008, I tendered to the Clerk of Court a hard copy of the foregoing prior to the CM/ECF system being set up in this matter.

I hereby certify on this 17th day of April 2008, that I served or made arrangements to serve a copy of the foregoing Memorandum of Points and Authorities in Support of Plaintiff's Motion for Temporary Restraining Order, as well as the Exhibits, and Affidavit of David M. Carver in support thereof on the defendants as follows:

| | |
|---|---|
| Kenneth Feltman | A copy was given to the process server to serve upon Mr. Feltman at the address listed on the Complaint. |
| Anthony Hawks | A copy was sent to the process server to serve upon Mr. Hawks at the address listed upon the Complaint.  Further, a copy was sent via electronic mail to him at his known email address; hawks@starpower.net. |
| Employers Council on Flexible Compensation, Ltd. | A copy was given to the process server to serve with the Complaint upon Terrance R. McKain at the address listed on the Complaint and a copy was sent by hand delivery to the registered office; i.e. 1015 15th Street, N.W., Suite 1000, Washington, D.C. 20005 |

25

Bernard J. DiMuro, Esquire
Virginia State Bar #18784
*Counsel for Plaintiff*
DiMuroGinsberg, P.C.
908 King Street, Suite 200
Alexandria, Virginia 22314
Ph. (703) 684-4333
Fax (703) 548-3181
bdimuro@dimuro.com