IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|                              |     |                   |
| ---------------------------- | --- | ----------------- |
|                              | )   |                   |
| THE FLEXIBLE BENEFITS        | )   |                   |
| COUNCIL,                     | )   |                   |
|                              | )   |                   |
|     Plaintiff,               | )   |                   |
|                              | )   |                   |
|                              | )   |                   |
|         v.                   | )   | 1:08cv371 (JCC)   |
|                              | )   |                   |
|                              | )   |                   |
| KENNETH FELTMAN et al.,      | )   |                   |
|                              | )   |                   |
|     Defendants.              | )   |                   |
|                              | )   |                   |

**M E M O R A N D U M   O P I N I O N**

_____     This matter is before the Court on the issues of

statutory damages, attorney's fees, and costs.  For the following

reasons, the Court will grant Plaintiff's request for statutory

damages and grant its request for attorney's fees and costs.

### I. Findings of Fact

Based on the credibility of the witnesses, the law, and

the evidence presented, the Court finds, by clear and convincing

evidence, that the relevant facts are as follows.  Plaintiff The

Flexible Benefits Council ("Plaintiff") was incorporated in 1981

as a non-profit corporation under the laws of the District of

Columbia.  Plaintiff was originally incorporated under the name

"Employers Council on Flexible Compensation" and did business

under that name for 27 years.  The organization promotes flexible

1

benefit compensation programs through lobbying and informs members, national opinion leaders, and the general public about the benefits of such programs.

During those 27 years, Plaintiff continuously and exclusively used "Employers Council on Flexible Compensation" as a trade name and service mark in connection with its goods and services and, since 1999, on its website, "ecfc.org," and related links.  Plaintiff used the acronym "ecfc" and an "ecfc" logo in the same manner as the "Employers Council on Flexible Compensation" name since the early-to-mid-1980s.  (Plaintiff's name, acronym, and logo are, collectively, "Plaintiff's Marks" or the "Marks").  Defendant Kenneth Feltman ("Feltman") was aware of this use.

Feltman was responsible for Plaintiff's management and operations between 1985 and July 2007.  He began as an employee of Plaintiff, later became its Executive Director, and was eventually selected to be one of its corporate officers.  In 1997, Feltman incorporated Radnor, Inc. ("Radnor"), an association management company.  Radnor entered into separate management service agreements ("MSAs")  with Plaintiff in 1997, 2003, and 2005, under which it provided Plaintiff with management services.  Plaintiff terminated Radnor's services on July 31, 2007.

2

Nearly nine years before that termination, in September 1998, the District of Columbia revoked Plaintiff's corporate charter for failure to file annual and bi-annual reports and failure to pay the required filing fees.  Plaintiff was unaware of the revocation and continued to conduct its business without interruption.  Plaintiff learned of the revocation on March 31, 2008 when Defendants revealed this information.  Plaintiff successfully filed for corporate reinstatement on April 10, 2008, but was unable to reinstate itself under its former name.  Instead, Plaintiff chose "The Flexible Benefits Council" as its new legal name, but maintained its same website, "ecfc.org."

On November 13, 2007, pursuant to the 2005 MSA, Plaintiff filed a demand for arbitration against Radnor, accusing Feltman and Radnor of pilfering millions of dollars from Plaintiff.  In February 2008, Feltman and Defendant Anthony W. Hawks ("Hawks") responded by forming a new corporation in the District of Columbia named "Employers Council on Flexible Compensation Ltd." ("ECFC Ltd.").  ECFC Ltd.'s stated purpose is to perform the same type of work as Plaintiff.  Hawks and Feltman each own fifty percent of this for-profit corporation.  Feltman and Hawks also reserved the acronym "ECFC," the name "Employers Council on Flexible Compensation," and twenty-one variations on that name with the District of Columbia Office of Consumer and Regulatory Affairs (DCCRA).  The formation of ECFC Ltd. and the

reservation of these names and the "ECFC" acronym accomplished Defendants' intended purpose to preclude Plaintiff from reinstating its corporate charter with its old name and acronym or one similar to it.

On March 3, 2008, Hawks applied to the United States Patent & Trademark Office ("USPTO") to register the mark "Employers Council on Flexible Compensation"; on March 4 he applied to register a design mark identical to Plaintiff's "ecfc" logo. ECFC Ltd. also obtained the domain name "ecfc.com," which is similar to both of Plaintiff's Marks. The website that Defendants posted at that domain was also nearly identical to Plaintiff's "ecfc.org" website in both its design and its mission statement. Defendants' website received several "hits" and at least one e-mail that was intended for Plaintiff. Defendants also engaged office space for ECFC Ltd. on the same street and with the same suite number as Plaintiff's offices.

In addition, on March 31, 2008 Radnor filed suit against Plaintiff and its individual board members in the Superior Court of the District of Columbia ("D.C. Litigation"), arguing that the Court should declare Plaintiff dissolved and place it in receivership. Defendant Hawks, an attorney licensed to practice law in the Commonwealth of Pennsylvania and the District of Columbia, represented Radnor in the arbitration and the District of Columbia Superior Court litigation.

4

## II. Procedural Posture

On April 17, 2008, Plaintiff filed a complaint ("Complaint") in this Court against Defendants Feltman, Hawks, and ECFC Ltd. (collectively, "Defendants") alleging six counts: (1) trademark and service mark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) copyright infringement; (3) violation of the Federal Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); (4) breach of fiduciary duty (against Defendant Feltman only); (5) common law civil conspiracy; and (6) interference with business and business expectations.  On November 12, 2008, the Court, on Plaintiff's motion and no objection by Defendants, dismissed Counts IV-VI of the Complaint without prejudice.

On September 11, 2008, Plaintiff filed a Motion for Summary Judgment on Counts I and III.  Defendants filed a Memorandum in Opposition on September 25, 2008.  Plaintiff replied on October 6, 2008.  The Court heard oral arguments on October 15, 2008.  On October 22, 2008, the parties entered into a consent order ("Consent Order"), in which Defendants agreed "not to contest further the distinctiveness of Plaintiff's marks" or "Plaintiffs [sic] ownership of or rights in" those marks, and agreed "that Plaintiff's marks are subject to the protections of the Lanham Act."  (Consent Order 1-2.)

The Consent Order also permanently enjoined Defendants from using, in any manner, Plaintiff's Marks and any other marks or names affiliated with Plaintiff, or anything similar thereto. Defendants also agreed to provide a list of all trade, business, and domain names registered by Defendants and their agents since January 1, 2008 and to transfer the domain name "ecfc.com" to Plaintiff.

On October 16, 2008, Plaintiff submitted a supplemental memorandum in support of its requests for statutory damages and attorney's fees. In opposition to these requests, Defendants filed their own supplemental brief covering these issues and a sworn declaration by Defendant Hawks. Plaintiff responded with a second supplemental memorandum rebutting Hawks's affidavit on October 30, 2008. The parties submitted proposed findings of fact on November 4, 2008. The Court held an evidentiary hearing on the remaining issues on November 5 and 6, 2008.

## III.  Analysis

At the outset, the Court recognizes that Defendants have admitted liability for trademark infringement under 15 U.S.C. § 1125(a) (Count I) and cybersquatting under 15 U.S.C. § 1125(d) (Count II) in the Consent Order. As agreed to by the parties, the issues remaining for the Court are Plaintiff's requests for two of the types of damages available under these statutes: attorney's fees and costs, and statutory damages.

6

When a violation of 15 U.S.C. §§ 1125(a) (trademark infringement) or (d) (cybersquatting) "shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  As an alternative remedy for cybersquatting violations, a plaintiff may elect to recover statutory damages in lieu of actual damages and profits.  *Id.* at § 1117(d).  The amount of the statutory damages that a court may award is "not less than $1000 and not more than $100,000 per domain name, as the court considers just."  *Id.*  In addition, for both trademark infringement and cybersquatting claims, "the court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).

In its Complaint, Plaintiff requested three types of relief: attorney's fees and costs, injunctive relief, and statutory damages in the amount of $100,000.  The Consent Order makes Plaintiff's request for injunctive relief moot.  Plaintiff does not allege any actual damages to itself or profits earned by Defendants in its trademark infringement claim.  The Court finds that Plaintiff has, however elected to recover statutory damages for its cybersquatting claim by requesting those damages in the

Complaint and its Motion for Summary Judgement.  The Court will evaluate each of Plaintiff's requests for damages in turn.

    A.   <u>Attorney's Fees and Costs</u>

An "exceptional case" warranting attorney's fees is one that involves malicious, fraudulent, willful or deliberate conduct.  *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 599 (4th Cir. 1991) *cert. denied*, 506 U.S. 862 (1992). In the Fourth Circuit, a case is "exceptional" only if a prevailing plaintiff can also "prove bad faith on the defendant's part."  *Id.*  This makes the Fourth Circuit standard for awarding attorney's fees somewhat higher than that of several other circuits.  *See, e.g.*, *Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 31-32 (1st Cir. 2002) (collecting cases).

Once a district court determines that a case is "exceptional," it "must then determine, at its discretion, whether awarding attorney's fees is warranted given the circumstances of the case."  *Thomas & Betts Power Solutions, L.L.C. v. Power Dist., Inc.*, Slip Copy, 2008 WL 373639 (E.D. Va. Feb. 8, 2008) (*citing Synthon IP, Inc. v. Pfizer, Inc.*, 484 F. Supp. 2d 437, 441 (E.D. Va. 2007) (*citing Enzo Biochem., Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1370 (Fed. Cir. 1999))); *MercExchange, LLC v. eBay, Inc.*, 521 F. Supp. 2d 526, 528 (E.D. Va. 2007) (*citing Phonometrics, Inc. v. Westin Hotel Co.*, 350 F.3d 1242, 1245 (Fed. Cir. 2003)).

8

District courts have broad discretion to determine whether attorney's fees are warranted. *Scotch Whisky*, 958 F.2d at 599 (*citing Shell Oil Co. v. Commercial Petrol., Inc.*, 928 F.2d 104, 108 n.6 (4th Cir. 1991)).  But both the occurrence of the "underlying improper conduct and the characterization of the case as exceptional must be established by clear and convincing evidence." *Id.; see also Synthon IP, Inc. v. Pfizer, Inc.*, 484 F. Supp. 2d 437, 441 (E.D. Va. 2007) (*citing Enzo Biochem., Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1370 (Fed. Cir. 1999)).

Plaintiff argues that Defendants' infringing actions and their conduct during this litigation make this case an "exceptional" one that merits an award of attorney's fees. Defendants argue that this case is not exceptional because their actions were undertaken in good faith and with the reasonable belief that Plaintiff had no legal right to the Marks.

1. *Exceptional Circumstances*

As noted above, exceptional circumstances exist when a defendant's conduct was "malicious, fraudulent, willful,[1] or deliberate in nature." *People for Ethical Treatment of Animals (PETA) v. Doughney*, 263 F.3d at 370.  Such conduct can occur during the infringement itself or during the course of litigation regarding the infringement. *See Spiroflow Sys., Inc. v. Flexicon*

---

[1] Willfulness is defined as "voluntary and intentional, but not necessarily malicious" conduct, although some courts also imply a requirement of bad intent.  Black's Law Dictionary 1630 (8th ed. 2004).

*Corp.*, Slip Copy, 2008 WL 4371383, at *2 (W.D.N.C. 2008) (*citing Brooks Furniture Mfg., v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005)).

Factors to be considered by a court in determining whether exceptional circumstances exist include: "the closeness of the case, tactics of counsel, the conduct of the parties and any other factors that may contribute to a fairer allocation of the burdens of litigation as between winner and loser." *Id.* (internal citations and quotations omitted); *see also Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1482 (Fed. Cir. 1998) ("Findings of exceptional case have been based on a variety of factors, for example, . . . vexatious or unjustified litigation, or other misfeasant behavior.").

`a. *Willful and Deliberate Infringement*

The evidence shows that Defendants built the "ecfc.com" website in order to divert consumers from Plaintiff's "ecfc.org" website for commercial gain and to tarnish Plaintiff's Marks and reputation. Defendants purposely acquired a domain name confusingly similar to Plaintiff's existing website. (Hawks Depo. 28; Feltman Depo. 263-64.) They literally copied Plaintiff's logo and mission statement (with the exception of four words) from "ecfc.org" to "ecfc.com." (Feltman Depo. 28-30; Hawks Depo. 91-92.) Defendants also incorporated a new entity under the name that Plaintiff had used since 1981 and reserved

the "ecfc" acronym, the "Employers Council on Flexible
Compensation" name, and twenty-one variations on that name to
"prevent" Plaintiff from reinstating its charter under its former
name or acronym.  (Feltman Depo. 36-41.)  They also discussed the
possibility of setting up their own booth at one of Plaintiff's
trade fairs, using the ECFC Ltd. name, in order to "cause
consternation in the ranks."  (Pl.'s Mot. for Summ. J. Ex. 29 (e-
mail from Hawks to Feltman).)

        The motives behind Defendants' actions were twofold.
First, Defendants believed that the "business" of flexible
compensation was worth one million dollars per year and they
wanted to divert this profit to themselves.  (Feltman Depo. 263-
64; Hawks Depo. 28, 47-51.)  Second, they believed that
Plaintiff's new Executive Director had stolen the company, and
its profits, from Feltman.  (Feltman Depo. 263-64; Hawks Depo.
28, 47-51.)  Feltman also believed that Plaintiff had stolen
furniture, equipment, and records from both himself and Radnor
and that Plaintiff had breached the MSAs when it terminated
Radnor's (and Feltman's) services.  *Id.*

        Defendants also took these actions surreptitiously.
(Hawks Depo. 47-51; Hr'g Tr. 149.)  They repeatedly tried to
undertake their infringing actions without alerting Plaintiff to
their plan.  (Pl.'s Ex. 132 (Defendants incorporated ECFC Ltd.
using a Nevada corporate services company); Hawks Depo. 110-21

(Defendants used Hawks's daughter's then-boyfriend as ECFC Ltd.'s initial incorporator and director); Hawks Depo. 586-87, 594-95 (Hawks chose not to interview the attorney who previously served as Plaintiff's registered agent so as not to alert Plaintiff to the lapse of its corporate charter); Pl.'s Ex. 96 (e-mail noting that Feltman obtained the "ecfc.com" domain name using a hidden registration so "no one will know we are the owner [sic]").)

Defendants now argue that, in spite of the fact that they established a new business to either compete with, stand in for, or both, Plaintiff's business, they did not intend to "actively solicit anyone associated with [Plaintiff] until the various pending litigation [sic] . . . was resolved." (Hawks Depo. 98.)  They also submit that their website was "live" for only a short period of time and that it brought in no revenue. (Feltman Depo. 80 ("ecfc.com" went up April 1, 2008).)  Finally, Defendants cooperated in taking down that website (Prelim. Inj. Order, June 18, 2008 ("ecfc.com" taken down approximately June 18, 2008).)

The Court finds, however, that Defendants' consent to a preliminary injunction after Plaintiff filed suit against them does not negate Defendants' admissions.  They have admitted that they created "ecfc.com" with an intent to divert consumers from "ecfc.org," that they established their corporation, ECFC Ltd., to interfere in Plaintiff's ongoing operations, and that they did

12

all this with the ultimate goal of obtaining Plaintiff's profits for themselves.

It is apparent that Defendants were not accidental infringers operating with innocent motives. Defendant Feltman had a 20-year relationship with Plaintiff: he first served as an employee, then also as a corporate officer. He eventually became responsible for managing Plaintiff's operations through a management company that he established specifically for that purpose. While doing so, he retained his position as one of Plaintiff's corporate officers. (Ans. ¶¶ 10-11.) After Feltman's business relationship with Plaintiff ended, Feltman's desire to punish Plaintiff and benefit himself led him to take the actions for which he has been sued. (Hawks Depo. 47-51; Hr'g Tr. 149.) Hawks also believed that Plaintiff had stolen the value of Plaintiff's business from Feltman. (Hawks Depo. 47-51; Hr'g Tr. 149.) He therefore advised Feltman to undertake the infringing acts, assisted in them, and hoped to profit from them himself. (Hawks Depo. 26-29; Feltman Depo. 262-64; Pl.'s Exs. 26, 134, 136-52 (e-mails to and from Defendants).)

Defendants also argue that they did not willfully or deliberately infringe on the Marks because they believed that Plaintiff had no legal right to the Marks, given its revoked corporate status. They believed that their actions were did not infringe on Plaintiff's Marks, conducted legal research to

confirm this belief, and merely came to a different, but equally reasonable, opinion on an open question of law.  Defendants rely on *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60 (5th Cir. 1992), and *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217 (2d Cir. 1987), to support their argument that the legal research that they performed should lead the Court to find that they did not willfully or deliberately infringe on Plaintiff's Marks.

In *CJC Holdings*, the Fifth Circuit found that "[a] district court normally should not find a case exceptional where the party presents what it in good faith believes may be a legitimate defense."  979 F.2d at 66 (citation omitted).  These statements, however, were merely dicta.[2]  Further, the plaintiff in that case had prevailed on a default judgment, a far different situation than that presented here, where Defendants initially litigated, but then ultimately admitted liability for, trademark infringement and cybersquatting.  *Id.* at 67.

By contrast, in *Centaur*, the Second Circuit affirmed an award of attorney's fees because, although defendant reasonably doubted the validity of plaintiff's trademark, "it failed to point to any investigation it made before it [infringed]."  830 F.2d 1229.  Defendants argue that they should not be liable for

---

[2] The Fifth Circuit never reached the issue of attorney's fees in *CJC Holdings*.  979 F.2d at 67.

14

Plaintiff's attorney's fees because they both doubted the validity of Plaintiff's Marks *and* investigated the law regarding Plaintiff's ability, as a revoked corporation, to accrue and possess trademark rights.

Based on the evidence presented and the credibility of the witnesses, the Court finds that this so-called "investigation," performed by Defendant Hawks, does not negate Defendants' intentional, deliberate, and premeditated actions to infringe upon Plaintiff's Marks.  Hawks's testimony only further implicates Defendants because it showcases his failure to undertake any meaningful or timely research of the applicable law.

First, Defendant Hawks was not an expert in trademark law.  (Hr'g Tr. 31.)  In fact, he was generally unfamiliar with that area of law.  (Hr'g Tr. 31.)  Prior to March 2008, when Defendants incorporated ECFC Ltd., reserved trade names with the DCCRA, and attempted to register the Marks with the PTO, Hawks's only research into this area of law was reading Chapter 17 of the treatise McCarthy on Trademarks and Unfair Competition, which covers the loss of trademark rights.  (Hr'g Tr. 31-32.)

Even more, Hawks had undertaken no research whatsoever before Defendants formulated their plan to harm Plaintiff and took their first steps to implement that plan.  On January 30, 2008, for example, Hawks sent an e-mail to Feltman stating: "I

have some more thoughts on the ECFC revocation, but the next step there is to grab the name  by incorporating a new ECFC." (Pl.'s Ex. 85.)  On February 6, 2008, Feltman forwarded to Hawks an offer from the then-owner of "ecfc.com" to sell the domain name to Feltman for $3000.  (Pl.'s Ex. 86.)  An e-mail from Feltman to Hawks on March 11, 2008 confirms that Defendants had already acquired the domain name and used a hidden registration so "no one will know we are the owner [sic]." (Pl.'s Ex. 96.)

Second, Hawks' testimony regarding the timing and substance of this "investigation" is inconsistent.  The affidavit that he submitted to the Court on October 16, 2008 conflicts with his testimony at the hearing on November 5-6, 2008.  The former represents that Hawks conducted more legal research and at an earlier time than he admitted to performing at the hearing. (*Compare* Hawks Aff. ¶¶ 8, 10, 12-14, 18, 22; Hr'g Tr. 29-35, 39-49.)

From these conflicting sources, and considering the credibility of this witness, the Court finds that, prior to undertaking their infringing course of action and acquiring the domain name ecfc.org, Defendants conducted no research into the legality of their intended actions.  (Hr'g Tr. 31-32.)  It also finds that, prior to incorporating under the name "Employers Council on Flexible Compensation," Defendants had only referred to one chapter of the McCarthy treatise.  (Hr'g Tr. 31-32.)  It was only after Plaintiff filed this suit that Hawks undertook to

16

read the cases cited in the single McCarthy chapter that he had
reviewed.  (Hr'g Tr. 31, 33.)  At no time did Hawks attempt to
pursue his research further or enlist the assistance of a
trademark expert.

Defendant Feltman was aware of Hawks's lack of research
into this area of law because he never received any invoice from
Hawks for legal services pertaining to trademark research.  (Hr'g
Tr. 38.)  He also did not receive any written opinion or research
materials from Hawks, because Hawks did not create any.[3]  (Hr'g
Tr. 50, 52-53.)

In sum, Defendants' legal conclusions were based on
glaringly deficient research: Hawks spent no more than two hours
looking into the crucial legal issue, relied on a single
treatise, did not independently read the cases referred to in
that treatise, and did not consult an expert in federal trademark
law.  (Hr'g Tr. 19-20, 31-35, 41-43.)  The Court finds that this
delayed and cursory research could not have provided Defendants
with a good-faith or sincerely-held belief that their actions
were lawful.  While Defendants argue that additional research
would not have made a difference, that argument does not support
their claim that they subjectively believed in the legality of

---

[3] In some cases, reasonable reliance on the competent advice of counsel
may negate a finding of willfulness.  *NTP, Inc. v. Research in Motion, Ltd.*,
270 F. Supp. 2d 751, 755 (E.D. Va. 2003) *rev'd in part on other grounds*.
Defendants do not assert this defense, but Plaintiff argues that, if they did,
it would not apply.  The Court does not find it necessary to address the
unasserted defense of advice of counsel separately.

their actions.  Their argument about the futility of additional research is also contradicted by the testimony of Timothy J. Lyden, Plaintiff's expert on trademark law.

At the hearing, Mr. Lyden stated that, had he done the research regarding the type of trademark use that Defendants engaged in, he "would have cautioned [his] client not to file" trademark applications to register the Marks with the PTO because "[r]egardless of its corporate status, [Plaintiff] actually was using the mark in connection with the same services that were listed in the application filed by Defendants."[4]  (Hr'g Tr. 251.) He also stated that, in the course of his research, Hawks should have reviewed other parts of the McCarthy treatise, namely § 9:11, which addresses the legal principles regarding whether federal trademark rights are not adversely affected by an entity's failure to maintain its charter.  (Hr'g Tr. 251.; Pl.'s Mem. in Opp'n at Ex. 44 (Expert Report of Timothy J. Lyden).)  He also stated that Hawks should have found the case *Committee for Idaho's High Desert v. Yost*, 881 F. Supp. 1457 (D. Idaho 1995), *aff'd in part, rev'd in part on other grounds*, 92 F.3d 814 (9th Cir. 1996)).[5]  (Hr'g Tr. 252-53.)  Finally, Mr. Lyden testified

---

[4] Plaintiff also argues that Defendants filed fraudulent trademark applications with the USPTO.  Given the amount and character of Defendants' other conduct in this case, the Court need not address the alleged fraudulence of these applications, which Defendants later withdrew.

[5] In its Motion for Summary Judgment, Plaintiff relied on *Yost* to argue that any "incapacity [that] Plaintiff may have under state law" as a result of the revocation of its corporate charter did not adversely affect its federal trademark rights or the enforceability of those rights in federal court.

that he did not think that Defendants had a good faith belief that Plaintiff's rights in the Marks were extinct.  (Hr'g Tr. 258-59; Pl.'s Mem. in Opp'n at Ex. 44 (Expert Report of Timothy J. Lyden).)

The arbitrators who addressed a similar legal argument by Defendants - that they were not bound by the MSAs because Plaintiff's charter had been revoked when it entered into them - essentially agreed with Mr. Lyden on this point.  (Pl.'s Mot. for Summ. J. Ex. 7 at 2 (Am. Arbitration Assoc., Third Interim Order, May 22, 2008).)  They found that Defendants' argument was based on a District of Columbia case that explicitly recognized equitable exceptions to the rule that a corporation with a lapsed charter is "wholly without power to contract" during that period. (Pl.'s Mot. for Summ. J. Ex 7 at 3.)  Relying on these exceptions, the arbitrators found that Radnor's responsibility for the lapse of Plaintiff's charter and its waiver of the argument by participating in arbitration "render[ed] it unreasonable to charge ECFC with responsibility for the revocation of its charter."  (Pl.'s Mot. for Summ. J.  Ex. 7 at 2-3.)

---

(Pl.'s Mot. for Summ. J. 28-29.)  *Yost* found that "any incapacity Plaintiff may have under Idaho law does not prevent or adversely affect Plaintiff's right to bring an action in the United States District Court to enforce rights created by federal law."  881 F. Supp. at 1470.  It appears to take for granted, however, that the plaintiff possessed Lanham Act rights to enforce. *Id.*

The Court finds, based on the essential character and purpose of Defendants' actions and all the arguments discussed above, that Defendants acted willfully, intentionally, and with premeditation to commit trademark infringement and cybersquatting.

        b.   *Bad Faith*

As noted above, the Fourth Circuit also requires a prevailing plaintiff to prove "bad faith" by the defendant in order to obtain an award of attorney's fees. *Scotch Whisky*, 958 F.2d at 599.  Bad faith is defined as "dishonesty of belief or purpose."  Black's Law Dictionary 149 (8th ed. 2004).  It has also been defined as "a design to mislead or deceive another . . . not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive." Black's Law Dictionary 139 (6th ed. 1990).

Plaintiff argues that Defendants acted in bad faith when they (1) infringed upon Plaintiff's Marks in an attempt to force Plaintiff to settle Defendants' frivolous claims in the D.C. Litigation, (2) concealed the revocation of Plaintiff's charter from Plaintiff while they capitalized on it, (3) proceeded without a reasonable belief in the legality of their actions, (4) engaged in evasive and stalling litigation tactics, (5) took these actions to compete with Plaintiff and to harm it, and (6) relied on Hawks's legal advice despite his "numerous

personal and business conflicts of interest." (Pl.'s Supp. Mem. Rebutting Hawks's Aff. 3-8.)

Defendants submit that they did not act in bad faith and note their (1) investigation of the relevant law, (2) reasonable, subjective belief in the legality of their actions, and (3) cooperative conduct throughout this litigation.

The Court discussed Hawks's "investigation" into the legality of Defendants' adoption of Plaintiff's Marks in section III.A.1.a, above. For all the reasons stated in that section, the Court finds that his research can not have formed the basis of any true good faith belief by the Defendants that their actions did not infringe on Plaintiff's Marks. Their argument, insofar as it relies on this research, provides no harbor for Defendants.

Defendants also argue that they had a subjective belief that their actions were legal and that this precludes a finding of bad faith. Even assuming such a subjective belief, which is not borne out by the evidence, Defendants' own statements make it clear that they did not proceed innocently; they sought to and intended to harm Plaintiff and "steal" its business by adopting its corporate name, registering and using the Marks, and creating confusion regarding Plaintiff's website. (Hawks Depo. 47-51.)

Finally, the Court finds that, while Defendants did cooperate with Plaintiff at some points during the course of this litigation, they also took other actions that obstructed its

21

progress.  Weighing Defendants' various actions, the Court finds
that, in total, Defendants' conduct hindered the progress of this
case and the resolution of Plaintiff's claims.

In their favor, the Court acknowledges that Defendants
entered into several consent orders in this matter.  They agreed
to a preliminary injunction that required them to withdraw a
personal jurisdiction defense, immediately suspend their use of
the Marks, take down the website posted at "ecfc.com," and
suspend their pending trademark applications on the Marks.
(Prelim. Inj. Order, June 18, 2008.)  Defendants also agreed to a
consent order that included a permanent injunction and several
admissions.  (Consent Order.)  The Consent Order effectively cut
short the parties' dispute regarding the merits of Plaintiff's
remaining claims.  Defendants also appeared at all hearings
scheduled in this case.  These actions assisted the forward
progress of the litigation and lowered the parties' related
attorney's fees and costs.

Defendants also repeatedly submitted meritless filings
throughout this case.  They filed unfounded objections to this
Court's personal jurisdiction over them.  (Pl.'s Findings of Fact
¶¶ 83-84.)  Then, they repeatedly filed obstructionist responses
during discovery.  ([Dkt. 55, 87, 105, 121, 163].)  The Court
decided a number of resulting motions by Plaintiff regarding
overly broad claims of legal privilege, and several motions to
compel production, in Plaintiff's favor.  ([Dkt. 55, 87, 105,

121, 163].)  Defendants further failed to appear at scheduled depositions and were only deposed after their depositions were scheduled before the Court.  ([Dkt. 188].)  These actions delayed and obstructed the smooth and timely progression of this litigation.  Considering the relative effects of Defendants variously helpful and dilatory actions, the Court finds that, overall, Defendants obstructed the resolution of Plaintiff's claims.  Their argument to the contrary, then, provides no basis for a finding of Defendants' good faith in this matter.

None of Defendants' proffered explanations excuse or in any way negate the substance and character of their infringing conduct.  It is very clear, based on the evidence and the credibility of the witnesses, that Defendants intentionally infringed on the Marks and did so with the intent to harm Plaintiff and to cause as much damage as possible before their actions were discovered.  *See* section III.A.1.a, above. Considering all of the evidence presented, the Court finds that Defendants acted in bad faith.

2.  *Court's Discretion in the Circumstances*

"It is clear that Congress did not 'contemplat[e] that the award of attorney's fees will become an ordinary thing in patent suits.'"[6]  *MercExchange, LLC v. eBay, Inc.*, 521 F. Supp.

---

[6] Congress employed identical language in 35 U.S.C.A. § 285, governing attorney's fees in patent infringement actions, and in 15 U.S.C.A. § 1117(a), governing attorney's fees in trademark actions.  Given the parallel language, courts apply the same standards in both cases.  *See, e.g.*, *CJC Holdings*, 979 F.2d at 65.

2d 526, 528 (E.D. Va. 2007) (*citing Rohm & Haas Co. v. Crystal Chem. Co.*, 736 F.2d 688, 691 (Fed. Cir. 1984) (*quoting* S. Rep. No. 1503, 79th Cong., 2d Sess. (1946))). "Rather, the purpose of Section 285 is to 'provide discretion where it would be grossly unjust that the winner be left to bear the burden of its own counsel which prevailing litigants normally bear.'" *Id.* (*citing J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1052 (Fed. Cir. 1987); *Rohm*, 736 F.2d at 692 ("[A] prevailing alleged infringer should be awarded attorney fees only when it would be unjust not to make such an award.")).

Even in light of this high standard, the Court finds that an award of attorney's fees is appropriate in this case. Attorney's fees are an extraordinary remedy applied only in those exceptional cases in which the Court finds, in its discretion, that they are warranted. The Court has found that Defendants' conduct was intentional, deliberate, and undertaken in bad faith. It also found that Defendants' purported investigation of the law regarding whether a revoked corporation can hold and acquire trademark rights was wholly abbreviated and untimely. It could not have and did not provide Defendants with a good-faith basis to believe that their actions did not infringe on Plaintiff's Marks. In this case, it is also clear that Defendants settled on their intended course of action before Hawks even then conducted his cursory legal research to justify it. Finally, Defendants' dilatory and bad faith conduct during the course of this

24

litigation[7] also contributes to the Court's decision to enter an award of attorney's fees.

The Court acknowledges one circumstances that does weigh against the award of attorney's fees in this matter. The fact that Defendants have not been involved in repeated trademark suits, distinguishing them from the litigants in *Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 433 (M.D.N.C. 2003), in which attorney's fees were awarded. It appears highly unlikely that Defendants would be involved in a situation such as this again. This one favorable fact, however, is heavily outweighed by the multiplicity of negative findings by the Court.

Further, an analysis of two cases in this district discussing the attorney's fees standard in 15 U.S.C. § 1117(a) also leads the Court to conclude that an attorney's fees award is appropriate here. In *PETA v. Doughney*, 263 F.3d at 370, a defendant intentionally registered a domain name similar to the plaintiff's in order to post a parody of the plaintiff. The defendant denied the plaintiff's request to take down his website voluntarily. *Id.* at 370. In *Cardservice International v. McGee*, 950 F. Supp. 737, 743 (E.D. Va. 1997), the defendant unintentionally registered a domain name similar to the plaintiff's, posted a website, and then refused to take it down

---

[7] The Court finds that Defendants' conduct in the other litigation and arbitration proceedings between these parties is not relevant to an award of attorney's fees incurred in this case. The Court makes no findings regarding that conduct and draws no conclusions therefrom.

until the plaintiff filed suit and obtained a preliminary
injunction.  Before the preliminary injunction took effect,
however, this defendant used his website to publically accuse the
plaintiff of theft and to refer potential customers to the
plaintiff's competitors.  He also declared "guerilla warfare" on
the plaintiff, informing it that he would "'bad mouth' the heck
out of [it]" and that it should "expect the internet not to be a
source of additional business.  Quite the contrary.  The internet
(with my help) may divert . . . business elsewhere."  *Id.*

     In *PETA*, the Court found that "exceptional
circumstances" did not exist because, while the defendant
intentionally used the plaintiff's mark, he did so not to steal
the plaintiff's business or to harm its reputation, but to
express an opposing political viewpoint.  263 F.3d at 370.  The
opposite result occurred in *Cardservice*, where the court found
that, although the defendant had no ill intent when he obtained
the infringing domain name, his "malicious actions and
statements" and use of the plaintiff's mark undertake "guerilla
warfare" against the plaintiff's "reputation and ability to do
business on the internet" established exceptional circumstances.
950 F. Supp. at 742.

     It seems clear that there was a similar element of
"guerilla warfare" in this case.  Defendants believed that
Plaintiff stole, among other things, a one million-dollar-per-
year business from Feltman.  They thereafter consciously and

repeatedly acted to usurp Plaintiff's business, to harm Plaintiff's reputation, and to conceal their infringing activities.  Nothing in either *PETA* or *Cardservice* provides support for Defendants' arguments that their purported (1) investigation of the relevant law, (2) reasonable, subjective belief in the legality of their actions, and (3) cooperative conduct throughout this litigation should preclude an award of attorney's fees.

First, the Court has already found that Defendants' "investigation" of the relevant law was wholly insufficient and provided no basis for any belief by Defendants that their actions were legal.  Second, following *PETA* and *Cardservice*, the Court finds that an award of attorney's fees does not depend on the nature or extent of Defendants' subjective beliefs in the legality or illegality of their conduct, but rather on the nature of and intent behind their infringing actions.  Third, Defendants' cooperative behavior after Plaintiff commenced this suit - suspending ECFC Ltd.'s operations and entering into various consent orders - cannot whitewash their efforts to harm Plaintiff.  Finally, the timing of Defendants "guerilla warfare," which occurred prior to Plaintiff's suit, is different from that in *Cardservice*, 950 F. Supp. at 742, where it occurred after the plaintiff complained about the defendant's infringing actions. The substance and effect of the defendants' activities is similar, however, and both are sufficient to merit an award of

27

attorney's fees.  It is the character of Defendants' actions, not their timing, that makes an award of attorney's fees meritorious.

In conclusion, the Court finds that Defendants' conduct was malicious, fraudulent, willful or deliberate in nature, and that Defendants acted in bad faith.  In its discretion, it finds that Plaintiff is entitled to an award of attorney's fees and costs.

B.   <u>Piercing the Veil</u>

Defendants argue that, should this Court award attorney's fees and costs to Plaintiff, the award should be entered against Defendant ECFC Ltd. only.  Defendants submit that all of the actions giving rise to a finding of liability for attorney's fees or damages were undertaken by the individual defendants on behalf of the defendant corporation.  Defendants provide no legal support for this argument and Plaintiff does not respond to it.  This is merely a belated argument that the claims against Feltman and Hawks, in their personal capacities, should have been dismissed from this suit.  Defendants raised the same argument in their Motion to Dismiss and the Court denied it in a Memorandum Opinion and accompanying Order on June 16, 2008.  This suit was filed, and proceeded, against Mr. Feltman and Mr. Hawks individually, as well as against ECFC Ltd.  Any award against the defendants will be entered against all of the defendants.

C.   Statutory Damages

In its Complaint and Supplemental Memorandum of October 16, 2008, Plaintiff requests the maximum amount of statutory damages permitted for ACPA violations: "not less than $1000 and not more than $100,000 per domain name, as the court considers just."   15 U.S.C. § 1117(d).   The imposition of these "statutory damages in cybersquatting cases [serves] both to deter wrongful conduct and to provide adequate remedies for trademark owners who seek to enforce their rights in court."   S. Rep. No. 106-140, at 8 (1999).

Plaintiff submits that, given Defendants' egregious conduct in this case, the Court should award it the maximum amount of damages.   Defendants assert that their good faith and reasonable belief that Plaintiff no longer owned the Marks make any amount of statutory damages inappropriate.   To this end, Defendants claim that, in February 2008, when they began using the Marks and registered the domain name "ecfc.com," they believed that the Marks were freely available.

The Court finds that Defendants' considered decision to register a domain name confusingly similar to Plaintiff's, with the intent to harm Plaintiff's good will and divert its profits to themselves, warrants an award of statutory damages. Defendants's argument that they held a subjective belief in the legality of their actions is unavailing because it has an

exceptionally weak basis in law and is unsubstantiated by the testimony presented.

The Court will award statutory damages to Plaintiff in the amount of $50,000. The Court finds that the following factors weigh in favor of this award: (1) Defendants' exploitation of the long and close working relationships among the parties, (2) the numerous acts that Defendants took to conceal their intention to infringe and their registration of the "ecfc.com" domain name, (3) the blatant nature of Defendants' infringement, and (4) Defendants' dismissive attitudes regarding their legal responsibilities.

The following factors weigh in favor of an award less than the statutory maximum: (1) the short time period that Defendants' "ecfc.com" website was live, (2) Defendants' non-existent profits from the operation of that website, and (3) the fact that there was only one instance of actual confusion. The Court, upon considering the relative weight of these factors and for all of the reasons discussed in this opinion, will award statutory damages in the amount of $20,000 to Plaintiff.

### IV. Conclusions of Law

As a matter of law, the Court has jurisdiction to decide this dispute under the Lanham Act, 15 U.S.C. § 1125(a) and the Federal Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). The Court finds that Plaintiff is entitled to judgment against defendants Employers Council on Flexible

30

Compensation Ltd., Kenneth Feltman, and Anthony W. Hawks, jointly and severally.  Plaintiff is entitled to an award of the costs of this action under 15 U.S.C. § 1125(a)(3).  It is entitled to an award of attorney's fees under 15 U.S.C. § 1117(a) in an amount to be determined.  Finally, Plaintiff is entitled to an award of statutory damages in the amount of $20,000 under 15 U.S.C. § 1125(d).  The Court will grant Plaintiff's request for attorney's fees and costs, and grant its request for statutory damages.

_____An appropriate Order will issue.

May 14, 2009                    _____/s/_____
Alexandria, Virginia                      James C. Cacheris
                                UNITED STATES DISTRICT COURT JUDGE

31